UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-60285-CR-ROSENBAUM(s)(s)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DARYL DAVIS,

        Defendant.
_____/

## ORDER ON MOTION FOR NEW TRIAL

This matter is before the Court on Defendant Daryl Davis's Motion for New Trial [D.E. 902]. The Court has carefully reviewed Defendant's Motion, all supporting and opposing filings, and the record. For the reasons that follow, the Court now denies Defendant's Motion.

### *I. Background*

Defendants Terrance Brown, Toriano Johnson, Daryl Davis, Hasam Williams, Joseph K. Simmons, and Bobby Ricky Madison, were indicted in a multiple-count Indictment. The Second Superseding Indictment charges all Defendants with conspiracy to commit Hobbs Act robbery between May 2010 and at least October 1, 2010 (Count 1). D.E. 262. More specifically, the Second Superseding Indictment alleges that Defendants conspired "to take U.S. currency and property from the presence and custody of employees of Brink's Incorporated . . . against such persons' will, by means of actual and threatened force, violence, and fear of injury to such persons . . . ." *Id.* at 1-2.

As the Second Superseding Indictment relates to Davis, Count 2 charges a July 26, 2010, attempted Hobbs Act robbery of Brink's security guards at a Bank of America in Lighthouse Point.

Count 3, in turn, asserts that Davis used and carried a firearm during, in relation to, and in furtherance of the attempted Hobbs Act robberies charged in Counts 1 and 2.

Counts 4 and 5 pertain to a September 17, 2010, attempted Hobbs Act robbery of Brink's security guards at a Bank of America branch in Miramar. *Id*. at 3-4. Count 4 charges the attempted robbery, while Count 5 alleges that Davis used and carried a firearm during, in relation to, and in furtherance of the attempted Hobbs Act robberies charged in Counts 1 and 4. *Id.* at 4.

Counts 6 through 8 all relate to an armored-car robbery that occurred on October 1, 2010, at a Bank of America branch in Miramar. Count 6 charges Hobbs Act robbery. *Id.* at 4-5. Relatedly, Count 7 alleges that Davis used and carried a firearm during, in relation to, and in furtherance of the Hobbs Act robberies charged in Counts 1 and 6. *Id.* at 5. Finally, Count 8 asserts that Davis used and carried a firearm during, in relation to, and in furtherance of the Hobbs Act robberies charged in Counts 1 and 6 and in so doing "caused the death of a person, Alejandro Nodarse Arencibia, a Brink's security guard, through the use of a firearm, which killing was a murder . . . ." *Id.* at 5-6.

Defendant Davis elected to proceed to trial in this matter. Before trial, on April 26, 2013, the Court held a status conference at which the trial schedule was discussed. At that time, the Court noted that it appeared as though trial in the matter would likely begin during the second week of the trial period, the week of May 27, 2013. *See* D.E. 710 at 128:5 - :10. The Government advised the Court that it anticipated that its case would require about two to three weeks to present. *Id.* at 128:11 - :20. Counsel for Co-defendant Johnson then requested that the Court please do "whatever we can do to get the trial done by June 28th" because he was scheduled for a prepaid two-week family vacation out of the country starting after that time. *Id.* at 128:23 - 129:14. When the Court contemplated starting trial on May 23 to try to ensure completion before Johnson's attorney's

vacation, counsel for Williams asked that the Court wait to start until May 28 (May 27 was Memorial Day) to avoid splitting the opening statements before and after the weekend. *Id.* at 129:23 - 130:5.

On May 16, 2013, the Court held a calendar call in this case. *See* D.E. 958. Once again, the issue of Johnson's counsel's two-week vacation starting June 29 arose. *See id.* at 24:22 - 34:4. The Court then set forth a likely trial schedule, and counsel for some of the parties advised the Court that they had conflicts on particular days that were intended for trial. *See id.* No parties objected to working around any attorney's conflict, so the Court agreed to accommodate all conflicts raised by determining that the trial would be in recess on the dates of the attorneys' conflicts. *See id.* The Court further explained,

> I'm going to tell [the jury] that I expect [that the trial] will take about five weeks. That if we're not done by June 28th, we're going to have a two-week recess, if you will, and then we will need them to return on July 15th to continue. It's not an exact science, but that's what our best estimate is, and if they're going to have any kind of problems during that time, they need to let me know up front. . . .

*Id.* at 37:10 - :16.

To accommodate the parties' concerns, the Court began jury selection on May 24, 2013. *See* D.E. 742. During jury selection, the Court specifically advised the *voir dire* panel that it hoped that trial would conclude by June 28, 2013, but if it did not, the Court would need to take a two-week recess, and the trial would continue during the week of July 15, 2013. Indeed, jurors who were unavailable the week of July 15, 2013, were stricken because of that fact.[1]

After jury selection, the trial began. The parties completed their closing arguments on June 27, 2013, and jury deliberations began late that same day. *See* D.E. 858. On June 28, 2013, the jury

---

[1] As of the date of this Order, the transcript of the proceedings on May 24, 2013, is not available. Accordingly, the Court relies on its best recollection.

sent the Court a note stating, "We can only come to a unanimous [sic] on all defendants [sic]. We only came to a unanimous decision regarding one defend[a]nt." D.E. 859 at 1. After a hearing with the parties, the Court sent back the following written response:

> We have received your note. Please continue your deliberations today. We know that we have previously advised you that if we did not finish by today, we would take off the next two weeks. However, please be aware that you may continue your deliberations after today, if necessary, next week beginning on Monday or whenever the entire jury is next available. Thank you.

*Id.* at 2.

Immediately after the Court conveyed this note to the jury, the jury sent out another note stating, "It is not a question of finishing today. It is that we are a hung jury for 4 of the 5 defend[a]nts." D.E. 860. The Court again held a hearing and decided to give the jury the Eleventh Circuit Pattern Instruction modified *Allen* charge. The jury then retired to deliberate a short while longer and then advised the Court that it wished to continue its deliberations Monday, July 15, 2013.

On Monday, July 15, 2013, the jury sent the Court another note. This one stated, "After reviewing all the evidence presented we are unable to come to a unanimous decision of not guilty or guilty of [sic] 4 of the defendants. We have exhausted all avenues (evidence). Thank you." D.E. 882 at 1 (emphasis in original). Once again, the Court discussed the jury's note with the parties. The Court advised the parties that it intended to send the jury the following note:

> I have received your note. I wish to advise you that you do not have to reach unanimous agreement on *all* of the charges before returning a verdict on *some* of them. Therefore, if you have reached unanimous agreement on any of the charges against any of the Defendants, we ask that you return your unanimous verdict with respect to each of those charges on which you have reached unanimous agreement. Thank you.

*Id.* at 2 (emphasis in original). Although some Defendants objected, Defendant Davis did not. During the hearing, the Court explained its intention that the note alert the jury that partial verdicts were an option. The Court further remarked that the instruction was specifically phrased to inform the jury that it should notify the Court if it had already reached partial verdicts and to avoid directing the jury to deliberate more. After hearing the parties' positions, the Court sent the note in its original form to the jury.

Shortly thereafter, the jury returned its partial verdicts for each Defendant, except for Simmons, for whom the jury returned a complete verdict. *See* D.E. 885, D.E. 886, D.E. 887, D.E. 888, D.E. 890. In particular, the jury acquitted Simmons of all charges, D.E. 885; convicted Williams of Counts 1, 2, and 9 (felon-in-possession charge), and acquitted him of Counts 4 and 5, D.E. 890; and convicted Davis, Johnson, and Brown of Count 1. With regard to all other charges against Davis, Johnson, Brown, and Williams, the jury reported that it was hung. *See* D.E. 886, D.E. 887, D.E. 888, D.E. 890.

Based on these events, Defendant Davis seeks a new trial. In support of his Motion, Davis claims the following alleged errors:

> 1. The jury, after receiving an *Allen* charge was unduly coerced to reach a verdict by the further instruction of the Court;
>
> 2. The verdict is contrary to the manifest weight of the evidence;
>
> 3. The Jury recess of two weeks, after the *Allen* charge, the further instructions of the court to the jury, together with cumulative effect of delay and further instructions deprived the Defendant of a fair and impartial trial.

D.E. 902 at 7. The Government opposes Davis's Motion, contending that no error occurred.

## *II. Discussion*

*A. The Court's Final Instruction to the Jury Was Not Unduly Coercive*

In his first basis for seeking a new trial, Davis argues that, "[i]n the context of the previous notes, the instructions, the *Allen* charge, the two (2) week recess, and the jury notes on July 15, 2013 that 'we are unable to come to a unanimous decision,' the Court's last instruction was unduly coercive in encouraging a partial verdict."[2] D.E. 902 at 9. Defendant further objects to the use of the word "we" in the final instruction, asserting that it "placed pressure on the jury and gave the impression that the Court, and the government and the Defendants ('we ask you') required of them at least a partial verdict." *Id.* In addition, Defendant suggests that the Court's final instruction "was the equivalent of communicating to the jurors that they 'have got to reach a decision' . . . . in the case,'" (citing *Jenkins v. United States*, 380 U.S. 445, 446 (1965)) and that it "implicitly suggested to the jury that a partial or compromise verdict was encouraged and would allow them to complete their deliberations and go home." *Id*.

This Court respectfully disagrees. The final instruction embodied a correct statement of the law, and it was not unduly coercive.

"Generally, district courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts . . . ." *United States v. Williams*, 526 F.3d 1312, 1320 (11th Cir. 2008) (quoting *United States v. Prather*, 205 F.3d 1265, 170 (11th Cir.

---

[2]Defendant Davis did not object to the final instruction before the Court provided the jury with it. *See, generally*, D.E. 954. Arguably, therefore, his objection to the instruction now is subject to plain-error review. *Cf. United States v. Moore*, 253 F.3d 607, 609 (11th Cir. 2001) ("Where . . . [an] appellant challenges a jury instruction for the first time on appeal, the instruction is reviewed for plain error") (citation omitted). Because the Court finds no error, however, the Court need not determine the appropriate standard of review for this issue raised for the first time in Defendant's Motion for New Trial.

2000)).  Here, the instruction satisfies this standard.

Rule 31(b), Fed. R. Crim. P., explicitly authorizes the return of a partial verdict in single and multiple-defendant cases:

> **(b)** **Partial Verdicts** . . .
>
> **(1)** **Multiple Defendants.**  If there are multiple defendants, the jury may return a verdict at any time during its deliberations as to any defendant about whom it has agreed.
>
> **(2)** **Multiple Counts.**  If the jury cannot agree on all counts as to any defendant, the jury may return a verdict on those counts on which it has agreed.
>
> \* \* \*

*See also* 18 U.S.C.A. § 3531 (directing reader to Fed. R. Crim. P. 31 regarding "[r]eturn; several defendants; conviction of less offense; poll of jury").  Consistent with Rule 31(b), the final instruction simply advised the jury that the return of a partial verdict was an option and emphasized that any partial verdict must be unanimous.  That instruction accurately states the applicable law.

Nor was the instruction unduly coercive.  In the Eleventh Circuit, a court must evaluate whether, under the totality of the circumstances, a given jury instruction was inherently coercive. *See United States v. Chigbo*, 38 F.3d 543, 545 (11th Cir. 1994) (applying this standard to review of the district court's *Allen* charge, its polling of the jurors, and a combination of the two).  Defendant cites three cases in support of his contention that the final instruction in this case was unduly coercive.  Two of them are materially distinguishable, and the third actually militates in favor of a finding that the instruction was not unduly coercive.

First, in *Jenkins v. United States*, 380 U.S. 445 (1965), about two hours after the jury retired

to deliberate, it sent a note advising that it had been unable to agree upon a verdict on both counts. In response, among other statements, the judge instructed the jury, "I am not going to accept this. You have got to reach a decision in this case," and "We have cases that are much harder than this one that juries decide." *Jenkins v. United States*, 330 F.2d 220, 221 & 221 n.1 (D.C. Cir. 1964), *rev'd*, 380 U.S. 445 (1965). Not surprisingly, the Court concluded that this instruction was coercive.

Unlike in *Jenkins*, the Court's final instruction in this case did not advise the jury that it had to reach a decision in the case or intimate in any way that the jury would not be released unless and until it came to a verdict. Nor did anything in the language of the instruction indicate that the Court required the jury to come to at least a partial verdict or that the Court would allow the jury to leave if it did. In fact, the instruction in this case employed the word "if," explaining, "***[I]f*** you **have reached** unanimous agreement on any of the charges against any of the Defendants, we ask that you return your unanimous verdict with respect to each of those charges on which you **have reached** unanimous agreement (emphasis added). "If" means "[i]n the event that," or "[o]n the condition that." *The American Heritage Dictionary of the English Language* 872 (4th ed. 2000). Thus, use of the word "if" suggested that the jury had more than one option: returning partial verdicts or not returning partial verdicts.

Moreover, the instruction employed the present-perfect tense ("have reached"), which, when used in the sense set forth in the instruction, conveys that an occurrence already happened at an indefinite time in the past. Indeed, during the conference immediately preceding the Court's final instruction, the Court explained that the instruction had purposely been drafted to refer to any partial verdicts upon which the jury had already agreed in the past, so as to avoid asking the jury to deliberate further. *See* D.E. 954 at 5:3-:20. Had the Court desired to ask the jury to continue its

deliberations, the instruction would have been asked in the present tense and would have directed, "*If you reach*," not "[i]f you have reached." Thus, the instruction did not advise the jury to continue its deliberations; rather, it asked the jury to report decisions that it had previously made.

The law assumes that jurors follow instructions. *United States v. Butler*, 102 F.3d 1191, 1196 (11th Cir. 1997) (citations omitted). And, given the brief amount of time that it took for the jury to return its partial verdicts after the Court sent the final note to the jury (Defendant describes the interval as fifteen minutes, *see* D.E. 902 at 9), it is apparent that the jury, in fact, complied with the instruction as written and simply reported back verdicts that it had previously reached with regard to the multiple counts pending against each of the five Defendants. As for the word "we" in the instruction, it neither bears on the conditional nature of the instruction nor somehow converts the instruction into a present-tense request. Consequently, the instruction's use of the word "we" is irrelevant to the analysis of whether the instruction is coercive.

Turning to the second case on which Defendant relies in arguing that the instruction was unduly coercive — *United States v. Fossler*, 597 F.2d 478 (5th Cir. 1979), the Court notes that the *Fossler* jury reported itself deadlocked, and the judge responded with an *Allen* charge. *Id.* at 483. When the jury again indicated that it was deadlocked, the court sent the jury home for the weekend. *Id*. The jurors reconvened on Monday, and the court sent the jury the original instructions again. *Id.* When the jury again advised the court that it was deadlocked, the court sent back the written *Allen* instruction that it had previously read to the jury. *Id.* An hour later, the jury returned a guilty verdict. *Id.*

The instant case is distinguishable from *Fossler* because the Court here gave the *Allen* charge only once — not twice, as the court had in *Fossler*. Moreover, the final instruction in this case,

unlike the second *Allen* charge in *Fossler*, did not ask the jury to conduct any further deliberations at all. Instead, it requested that the jury merely report any partial verdicts that it had previously reached.

Finally, Defendant cites *United States v. Rey*, 811 F.2d 1453 (11th Cir. 1987). In *Rey*, a panel of the Eleventh Circuit expressed its discontent with the *Allen* charge. *See id.* at 1458-60. Nevertheless, the panel recognized that it was "bound by precedent" to uphold the trial court's *Allen* charge instruction. *See id.* at 1460. Since *Rey*, the Eleventh Circuit has upheld the giving of the *Allen* charge many times. *United States v. Bush*, 727 F.3d 1308, 1320 (11th Cir. 2013) ("The *Allen* charge in this case was derived from the Eleventh Circuit pattern *Allen* instructions, which we have approved 'on numerous occasions'") (citation omitted). Indeed, the Eleventh Circuit has adopted a modified *Allen* charge as part of the Eleventh Circuit's Pattern Jury Instructions. And it is precisely that Eleventh Circuit-sanctioned instruction that the Court gave here.

As for the final instruction, nothing about that, which did no more than request that the jury advise the Court of any partial verdicts it had already reached and did not in any way even refer to the *Allen* charge previously administered, somehow rendered unduly coercive the modified *Allen* charge that the Eleventh Circuit has long approved. For all of these reasons, Defendant's Motion for New Trial, as based on the Court's final instruction, must be denied.

B. *The Verdict Will Not Be Set Aside*

Defendant contends that the verdict is "contrary to the manifest weight of the evidence." D.E. 902 at 7. Defendant's position, in turn, is composed of two arguments: (1) the verdict should be set aside because it is "irrational and inconsistent," *id.* at 10-12, and (2) the verdict is contrary to the manifest weight of the evidence, *id.* at 12-14. Neither contention has merit.

1. Inconsistent Verdicts Do Not Justify the Setting Aside of the Verdict

Defendant asserts that the jury's failure to return a verdict on any of the substantive counts against Davis but nonetheless to convict him of the conspiracy regarding the substantive counts renders the verdict inconsistent and the "product of irrationality." *Id.* at 10 (citations omitted). Not only does the Court disagree with Defendant's premise that his verdict was necessarily inconsistent, but even if it were, that fact alone does not warrant a new trial.

First, Defendant's verdict was not necessarily inconsistent. Defendant was charged along with five others in a multiple-count Second Superseding Indictment alleging a conspiracy to commit Hobbs Act robberies spanning the period from "at least as early as May 2010 . . . through on or about October 1, 2010 . . . ." D.E. 262 at 1. In addition, the Second Superseding Indictment charged the various Defendants with either two or three Brink's robberies or attempted robberies. *See, generally, id.* Defendant Davis was charged with all three Brink's robberies or attempted robberies. *See id.*

Unlike a multiple-object conspiracy, where the jury must unanimously agree on which object of the conspiracy the defendants agreed to try to accomplish, the conspiracy charge in this case alleged only a single object of the conspiracy: the "tak[ing] [of] U.S. currency and property from the presence and custody of employees of Brink's Incorporated . . . , against such persons' will, by means of actual and threatened force, violence, and fear of injury to such persons . . . ." *Id.* at 2. Therefore, as long as the jurors unanimously found that Davis agreed with at least one other person to try to commit robberies encompassed within the Hobbs Act and that Davis knew the unlawful purpose of the plan and willfully joined in it, it matters not whether the jurors agreed on which particular robbery or robberies Davis actually was involved in executing. Indeed, although the entire jury may have and, in fact, did find beyond a reasonable doubt that Davis had conspired to commit

Hobbs Act robberies of Brink's employees during the period alleged in the Second Superseding Indictment, some jurors may have thought that Davis was involved in one particular robbery only, while others may have been convinced that he participated solely in a different one of the three substantive robberies charged. If that occurred, it would have resulted in a conviction on the conspiracy count but not on the substantive counts on which the jurors could not agree. As a result, the mere fact that the jury did not return a guilty verdict on any of the three substantive robberies alleged is not necessarily inconsistent with the jurors' simultaneous conclusion that Davis nonetheless conspired to commit Hobbs Act robberies of Brink's employees during the charged time frame.

But even if Defendant Davis's verdict were necessarily internally inconsistent, Supreme Court and Eleventh Circuit precedent foreclose Davis's argument that inconsistent verdicts justify a new trial. As the Eleventh Circuit has recognized, the Supreme Court long ago established that "[c]onsistency in the verdict is not necessary." *United States v. Odom*, 252 F.3d 1289, 1298 (quoting *Dunn v. United States*, 284 U.S. 390, 393 (1932)) (internal quotation marks omitted). In explaining the rationale for this rule, the Supreme Court has observed that an inconsistent verdict may just as likely result from jury lenity as from the occurrence of any circumstance unfavorable to the defendant. *United States v. Powell*, 469 U.S. 57, 65-66 (1984). Attempting to make an individualized assessment of the reason for an inconsistency, however, would require a court to inquire into the jury's deliberations, a practice that is generally impermissible. *Id.* at 66. Moreover, juries take oaths to follow the law as charged and are expected to follow it. *Id.* Finally, a defendant already enjoys protection against irrationality or error through an independent review of the sufficiency of the evidence. *Id.* at 67. For all of these reasons, the mere existence of inconsistent

verdicts "do[es] not open a conviction on a particular count to attack." *United States v. Kramer*, 73 F.3d 1067, 1071 n.7 (11th Cir. 1996).

In *Odom*, for example, Boone, one of the defendants, was convicted of conspiracy to use fire or an explosive to commit a felony, in violation of 18 U.S.C. § 844(h)(1), but she was acquitted of the underlying predicate felonies. The Eleventh Circuit upheld the verdicts and noted, "As each count in an indictment is regarded as a separate indictment, merely the jury's choice to acquit on one charge does not have a res judicata effect on any other separate counts." 252 F.3d at 1298 (citing *Dunn*, 284 U.S. at 393). Rather, the Eleventh Circuit continued, inconsistent verdicts reflect only that the jury compromised. *Id.*

This case is materially indistinguishable from *Odom*. Like Boone, Davis was convicted of the conspiracy count but not of the underlying crimes that were allegedly the subject of the conspiracy. And, like with Boone, the most that may be deduced from the verdict here is that the jury may have compromised. Under Eleventh Circuit and Supreme Court precedent, that fact, in and of itself, is simply not enough to set aside the verdict. Accordingly, Defendant's Motion for New Trial, as it relies on this basis, must be denied.

2. Sufficient Evidence Supports the Verdict

Next, Defendant asserts that the evidence adduced at trial was insufficient to sustain a conviction. "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great — not merely the greater — weight of the evidence." *United States v. Cox*, 995 F.2d 1041, 1044 (11th Cir. 1993) (citation and internal quotation marks omitted). Indeed, the Eleventh Circuit has characterized this standard as requiring that the evidence "preponderate heavily against the jury's verdict," *Butcher v. United States*, 368 F.3d 1290, 1297 (11th Cir. 2004),

such that a "serious miscarriage of justice may have occurred," *United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005) (citation omitted). The reason justifying this standard rests on a concern that the judge not substitute her judgment for that of the jury, thereby depriving the litigants of their right to trial by jury. *See Cox*, 995 F.2d at 1044 (quoting *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980) (citation omitted)). Thus, only in an "exceptional case[]" should the court should interfere with the jury's factual findings. *United States v. Martinez*, 763 F.2d 1297, 1314 (11th Cir. 1985); *See also Butcher*, 368 F.3d at 1297 n.4 (where the evidence is sufficient for conviction, the court should grant a motion for new trial only in the "rare" case).

This does not present such an "exceptional case." Nathaniel Moss testified in tremendous detail to Davis's involvement in the two attempted robberies and the actual robbery charged in this case, as well as to his participation in a similar 2005 successful robbery. Significantly, Moss's testimony was corroborated by substantial other evidence of which Moss could not have known when he provided the Government with Davis's name and the details concerning Davis's participation in the robbery crew charged in this case.

Among such evidence was the following: according to telephone records, during the July 2010 Lighthouse Point attempted robbery charged in the Second Superseding Indictment, Davis's cellular telephone number used cellular towers near the Lighthouse Point bank branch where the attempted robbery occurred. Yet Davis lived and worked more than thirty miles away from there at the time. Nor did the telephone records reflect that Davis's cellular telephone number ever utilized the cellular towers near Lighthouse Point again.

In further incriminating evidence, co-conspirator Bobby Madison's cellular telephone — also in the Lighthouse Point area at the time — contacted Davis's cellular telephone after Madison and

co-conspirator Hasam Williams abandoned the stolen car that they had driven to the attempted robbery area and law enforcement was in pursuit of them. Madison and Williams's flight from the stolen car is likewise documented on surveillance footage from a nearby business, as well as through Williams's arrest with a firearm in Lighthouse Point at the time of the attempted robbery. Moreover, when Williams elected to provide a statement to law-enforcement officers at the time of his apprehension during the Lighthouse Point incident, he wiped his face using his shirt, and his shirt exhibited a light-colored residue that appeared to be some type of makeup. Previously, Moss had testified that Davis was a cosmetologist, that he had applied makeup to Williams, and that Williams had worn a dress for the robbery attempt. A search of the area where Williams was found resulted in the discovery of a woman's dress. In addition, Florida records showed that Davis, in fact, had some type of cosmetology license from the state, and other evidence demonstrated that Davis was absent from work on the day of the attempted robbery.

As for the September 17, 2010, attempted robbery in Miramar, video surveillance footage showed a loaner Miami-Dade Transit van passing through the bank's parking lot at the time of the attempted robbery. The damage on this van matched damage on the only loaner van in the possession of Miami-Dade Transit on September 16 and 17, 2010. Davis had worked at Miami-Dade Transit on September 16, 2010, at the location where the loaner van happened to be that day. Also, as with the July Lighthouse Point robbery, Davis was absent from work at Miami-Dade Transit on September 17, 2010.

With regard to the October 1, 2010, robbery, Moss testified that Davis used his black business van to conduct surveillance for the robbery. And, while the Government did not argue that the black van in the footage was Davis's because it could not prove that with certainty, the fact

remains that a vehicle matching the description of Davis's van appears at the bank in the time frame of the robbery. Moreover, cellular telephone records reflect that the telephone that Davis's defense conceded he used engaged in numerous calls with the cellular telephone attributed to Codefendant Brown up until the point of the robbery and that the cellular tower that Davis's telephone used to make and receive the calls was the one servicing the bank area. In addition, once again, Davis was absent from his work at Miami-Dade Transit on the day of the robbery.

Nor do Defendant's complaints about the evidence presented at trial cause the evidence adduced at trial to preponderate at all — let alone heavily — against the jury's verdict. Similarly, no evidence of a serious miscarriage of justice — or even a miscarriage of justice at all — exists in this case. Consequently, Defendant's Motion for New Trial must be denied to the extent that it rests on his claim of insufficient evidence.

C.  *The Cumulative Effect of the Alleged Errors Does Not Require a New Trial*

Defendant also requests that "the issues raised in this motion for new trial be considered separately on their merits and cumulatively in assessing whether the interests of justice require a new trial on all the Counts in the Second Superseding Indictment." *See* D.E. 902 at 14. He does not elaborate further on this argument, although the heading of the section asserts, "The Cumulative Effect of the Allen Charge, the Recess, and Subsequent Instructions Require a New Trial." *Id.* Therefore, below, the Court addresses the recess, the only claim of error not previously analyzed.

The trial schedule in any particular case is "uniquely committed to the sound discretion" of the trial court. *Eli Lilly & Co., Inc. v. Generix Drug Sales, Inc.*, 460 F.2d 1096, 1105 (5th Cir. 1972); *see also Hudson v. Blackburn*, 601 F.2d 785, 790 (5th Cir. 1979) ("A motion for a recess is addressed to the sound discretion of the trial court . . . ."). In the trial in this case, counsel for

Codefendant Johnson requested that the Court take a two-week recess if the trial proceedings were not completed by June 28, 2013, so he could go on his two-week prepaid family vacation out of the country. Thus, during the May 16, 2013, calendar call, the Court explained, "[I]f we don't finish the trial by [June 28], we're having a two-week recess in the middle of the trial." D.E. 958 at 25:7-:9. The Court then extensively reviewed the expected trial schedule, hearing various attorneys' requests for one-day recesses because of other commitments. *See id.* at 27:13-34:4. Indeed, even Defendant Davis's counsel made one such request. *See id.* at 31:11-:24. In so doing, he implicitly recognized that the trial schedule was tight enough that any requested recess could result in the trial's extension beyond June 28, thereby necessitating the two-week continuance that counsel for Johnson had requested. *See id.* ("I wasn't going to ask the court because I really don't want [Johnson's counsel] to miss going to, you know, Italy and I would rather not have a two-week pause. But I have a wedding of my wife's best friend's daughter in Boulder, Colorado.").

> After entertaining Davis's request for a one-day recess, the Court added,
>
>> [O]bviously, to the extent that you all can get together and find ways to present this trial as efficiently as possible without harming your clients' interests, I think that's in everyone's interests. And if I can do something to help you with that, you just let me know. I'm happy to do what I can to help you with that. And we can stay afterwards and come early if necessary to address legal issues so we don't take time away from when the jury is here, and hopefully, if we do all of those things, maybe we can finish before [Johnson's counsel] goes on vacation and avoid the two-week hiatus in the middle of the trial. If not, just so you all know, that's what it is and there will be the two weeks in the middle . . . ."

*Id.* at 32:16-33:3. After making these remarks, the Court asked whether anyone wished to be heard on the circumstances, and Davis's counsel did not respond. *See id.* at 33:4-34:14. Thus, it was clear to all parties even before trial began that a two-week recess would occur if the trial did not conclude

by June 28. As a result, counsel had the opportunity to plan their trial presentations accordingly.

Moreover, during jury selection, the Court also advised the *voir dire* panel that a two-week recess would occur in the trial if the trial were not completed by June 28. Perhaps because the jurors were well aware of this possibility from the outset of trial, many of them took copious notes, as acknowledged by other defense counsel. In other words, before the trial ever began, the jurors, counsel, and the parties all should have been mentally prepared for the possibility that a two-week recess would occur during the course of the trial. Moreover, Defendant has alleged no juror misconduct that occurred during the recess. Under these circumstances, the two-week recess did not constitute error.[3]

Finally, when viewed as a whole, the jury instructions, the recess, the allegedly inconsistent verdicts, and the evidence do not support the granting of Defendant Davis's Motion for New Trial. While the Court recognizes that the sum may, in some situations, be greater than its parts, that is not the case here. The only challenged event that Defendant raises in his Motion for New Trial that is even technically considered error regards the allegedly inconsistent verdicts. *See United States v. Powell*, 469 U.S. at 477 (describing inconsistent verdicts as a form of "error"). But, for the reasons discussed previously, the allegedly inconsistent verdicts do not support the setting aside of the verdict in this case. Nothing about Defendant's other complaints — none of which appear to this Court to point out error — in any way enhances the nature of the alleged "error" stemming from the

---

[3]Moreover, even if it had, much like with the "error" that inconsistent verdicts may represent, "[b]ased on the verdict alone, it is impossible to determine 'whose ox has been gored.'" *See United States v. Mitchell*, 146 F.3d 1338, 1344 (11th Cir. 1998) (quoting *United States v. Powell*, 469 U.S. 57, 65 (1984). In other words, it may be just as likely that the two-week recess softened some jurors' views and caused them to vote for acquittal on the charges where the jury hung as it is that some jurors decided to vote for conviction, when previously, they had not.

inconsistent verdicts. As a result, the amalgamation of Defendant's claims can justify a new trial no more than each of his independent objections.

### *III. Conclusion*

For the foregoing reasons, Defendant Daryl Davis's Motion for New Trial [D.E. 902] is **DENIED**.

**DONE and ORDERED** at Fort Lauderdale, Florida, this 23rd day of October 2013.

_____
ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies:        Counsel of Record